*NOT FOR PUBLICATION*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ROSARIO DIGIROLAMO,

        Petitioner,

v.

STATE OF NEW JERSEY, et al.,

        Respondents.

Civil Action No. 14-3431 (FLW)

OPINION

**WOLFSON, District Judge:**

Petitioner, Rosario Digirolamo, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges a conviction for aggravated manslaughter for which he received a sentence of prison term of twenty-five years, subject to an eighty-five percent parole disqualifier under the No Early Release Act, N.J. Stat. Ann. § 2C:43. For the reasons stated below, Petitioner's habeas petition is DENIED, and Petitioner is DENIED a certificate of appealability.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The following findings of fact by New Jersey Superior Court, Appellate Division on direct appeal are as follows[1]:

> On June 8, 2007, defendant killed the victim, Amy Giordano, by striking her on the head with a hammer. Defendant, who was married to another woman, was having an affair with the victim, and the parties had a child together who was ten months old at the time of the killing. After killing Giordano, defendant sawed her body into parts, stuffed her remains in a suitcase and dumped the suitcase in a pond on Staten Island. Defendant then drove to Delaware and abandoned his child in a parking lot at Christiana Hospital. Less than a week later, defendant fled the country, flying to Milan, Italy.

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

Approximately one week before Giordano's disappearance, defendant went to Lowe's Home Improvement in Paterson, where his friend John Russo worked. According to Russo, defendant discussed problems he was having with the victim and asked Russo about disposing of her body. When Russo and defendant went to a diner during Russo's lunch break, defendant disclosed that he had attempted to kill Giordano about a month earlier by crushing prescription sleeping pills and placing them in her drink. That attempt was unsuccessful because Giordano became nauseous but remained conscious. Defendant said he intended to kill Giordano by striking her on the head with a pry bar, and that he had a saw he could use to cut her up. When asked whether he told defendant of a spot where "something could be dumped and not be found," Russo admitted that when he and defendant were in the diner, he told defendant he knew of a pond where he had ice skated as a child.

Defendant purchased contractor bags, a Sawzall blade and drain cleaner from Lowe's. He showed Russo the type of pry bar he was going to use to hit Giordano. It was twelve inches long, made of steel and flat but with a curve on the end.

On June 8, 2007, defendant was observed on various surveillance videos shopping with the child. At 3:00 p.m., he purchased a fourteen-inch Buck Brothers saw.

Defendant contacted Russo that same day and, among other things, indicated that "[i]t's done." Later that day, defendant called Russo in a state of panic. He indicated that his Sawzall blade was not cutting properly, and he asked Russo what he should do. Russo told defendant he had no idea. Defendant then asked if Russo could meet him the next morning before Russo went to work so Russo could show him the location of the pond Russo had previously recommended.

The next morning, defendant met Russo, and they eventually proceeded to a pond on Staten Island. Russo drove to the pond in his own vehicle, and defendant followed. They parked near the pond. Defendant opened the trunk of his car, dragged out a dark-colored suitcase, and while Russo watched the child who was in defendant's car, defendant carried the suitcase into the woods. Russo heard a splash. Defendant returned and warned Russo, "You know you can never tell anybody about this." Defendant also said that he had "hit Amy in the back of her head [and] neck area," but Russo told defendant he did not want to know the details. Defendant told Russo he had used a hacksaw to cut up Giordano's body, which "worked just fine." He also indicated that when he cut up her body, he had worn old clothes, which he planned to throw away. Later that day, defendant took the child to Delaware, where he abandoned the child in a parking lot.

On June 26, 2007, the police executed a search warrant at Giordano's apartment and found blood throughout. Subsequent testing revealed that Giordano's DNA profile matched the blood recovered from the center hallway, bedroom door jamb, bedroom wall and bathroom door jamb.

After eight weeks of investigation, the police obtained a search warrant for defendant's home. On July 31, 2007, the police executed that warrant and found a Buck Brothers saw in a Lowe's plastic bag. The cardboard manufacturer's sleeve was on the blade of the saw.

On August 8, 2007, Detective R.S. MacConnell of the New Jersey State Police Crime Scene Investigation Unit examined the saw for fingerprints. One impression was found, but it could not be identified. Thereafter, the saw was examined and tested for blood DNA, with negative results.

In August 2007, defendant returned from Italy and turned himself in to the Delaware State Police on charges relating to the abandonment of his son. He later pleaded guilty to second-degree reckless endangerment and child abandonment, and he was sentenced to probation.

On December 21, 2007, the police interviewed Robert Carpenito, who said that his ex-wife, Rachel Stansbery–Finn, had spoken with defendant in June 2007. Stansbery–Finn reported that at that time, defendant was "not acting like himself" and that he had said, "[W]here [Amy Giordano] is, no one will find her." Carpenito agreed to call and meet with Stansbery–Finn in an effort to elicit further information concerning her communications with defendant. Carpenito also agreed to allow his conversations with Stansbery–Finn to be recorded.

At the direction of law enforcement, Carpenito recorded a conversation with Stansbery–Finn. During that conversation, Stansbery–Finn said that defendant "came to her home and admitted he killed Amy Giordano, placed her body in a suitcase and dumped the suitcase in a pond [on] Staten Island, New York."

On March 20, 2008, arrest warrants were issued for defendant and Russo. Defendant was arrested that day. A few days later, having spoken to the police, Russo accompanied them to Clay Pit Ponds State Park Reserve, pointing to the area where he had seen defendant enter the woods with the suitcase to dispose of Giordano's body. The police found a dark-colored suitcase in a shallow section of Clay Pit Pond. Inside the suitcase were empty heavy-duty compactor bags and debris. There was a hole in the suitcase through which body parts had fallen into the water. The police discovered a rib cage, spinal column and part of a pelvis in the water. Divers also discovered "various human bones and bone fragments" in the pond. The bones and bone fragments were analyzed and determined to contain DNA that positively matched Giordano's DNA. The victim's sawed-off head, hands and legs were never found. Also recovered from the suitcase were photographs and negatives. Among the photographs was a photograph of the child.

On April 29, 2008, Giordano's bones and remains were examined by forensic anthropologists Christopher W. Rainwater and Benjamin J. Figura of the Forensic Anthropology Unit of the Department of Forensic Pathology at the Office of Chief Medical Examiner (OCME) in New York. Rainwater and Figura concluded that the

remains "exhibit[ed] sharp force dismemberment trauma in the form of saw cuts." Rainwater examined the saw recovered from defendant's residence and used the saw to make experimental cuts in cow bones. When he compared the toolmark characteristics of the experimental cuts with the cuts on Giordano's bones, he concluded that the majority of the saw's characteristics were consistent with the saw marks on Giordano's bones, indicating that a similar saw was used to dismember Giordano.

In early May 2008, Detective Miller released the saw to Bradley Adams, Ph.D., of the OCME, for testing. The defense was not notified of the saw's release for testing. On May 8, 2008, Adams emailed Theresa Caragine of the OCME, requesting guidance on the procedure for testing the saw. Specifically, Adams noted that his investigation indicated that the New Jersey State Police had not dismantled the saw and removed the handle in order to test for blood and DNA under the handle. Adams asked if this should be done. The saw was then sent to the biology unit of the OCME and examined. The saw's handle was dismantled, and the entire saw and handle were tested for blood and DNA, with negative results. On June 17, 2008, the saw was delivered to the Forensic Anthropology Unit of the OCME for further testing.

On July 14, 2010, a defense expert, Peter R. DeForest of Forensic Consultants in Ardsley, New York, received the saw for his own assessment. DeForest also obtained saws from a retail store, the Home Depot, and the factory where the Buck Brothers saw was manufactured. He conducted microscopic examinations of the saws. He noted that the unused saws exhibited microscopic metal burrs on the edges of the saw teeth that are easily broken away with "slight" use of the saw. He also noted that each new exemplar saw contained a "lacquer-like" coating along the saw teeth, applied at the factory, that "is abraded away by the cutting action." Following his examinations and tests, DeForest found that "cutting a shallow kerf with a depth of a few millimeters in softwood profoundly alters the saw from its new condition." In examining the evidence saw, DeForest noted that the factory-applied lacquer-like coating on its teeth had been worn away. He also found that the black printed logo and lettering were smeared. DeForest assessed a photo taken by the OCME of the saw prior to the testing and observed that the photo suggested that "metallic burrs [were] present" on the teeth of the saw. He also noted that in the photo there was no smearing of the lettering on the side of the saw blade before the testing. DeForest concluded that the changes in the condition of the saw indicated that the saw was new before Rainwater tested it, and it therefore "could NOT have been used to saw through six bones and associated tissue."

Subsequently, defendant's work and home computers were seized and analyzed, pursuant to a search warrant. The examiner conducted a search of the hard drives for key words provided by the case agent. The examiner's search yielded indications that defendant had researched Delaware orphanages before abandoning his child on June 9, 2007, as well as data files such as Mapquest pictures of the area where the child was abandoned.

In November 2010, defendant moved to dismiss the indictment or, in the alternative, to suppress the saw recovered from defendant's home. That motion was denied.

While preparing for trial, between December 20 and 23, 2010, an assistant prosecutor discovered a record of Google searches for "martial arts lethal blows to the head" on defendant's work computer, which searches were performed during the week leading up to Giordano's death. On December 23, 2010, defendant and his counsel met with the Mercer County Prosecutor's staff to discuss pretrial stipulations and other matters. At the end of the meeting, the prosecutors gave defense counsel additional pages of discovery, which included a report of the computer searches. The State did not bring the assistant prosecutor's findings specifically to defendant's attention. Defense counsel discovered the assistant prosecutor's findings while reviewing the discovery papers. The same day, the State provided defense counsel with a disk containing an expert report and a copy of the hard drive.

The parties conferred with the judge on December 24, 2010, concerning this late-submitted discovery. The court instructed defense counsel to file a motion. Defendant found an expert who would "definitely need a couple of weeks" to review the disk and prepare a report.

On December 28, 2010, defendant filed a motion to suppress the computer evidence or, in the alternative, to adjourn the start of trial. On January 3, 2011, the judge heard and denied defendant's emergent motion to suppress evidence obtained from a search of defendant's computer but granted defendant's alternative request for a two-week adjournment of the trial to permit the defense an opportunity to obtain a forensic computer expert. Defendant's plea followed.

*State v. DiGirolamo*, Indictment No. 09-01-0029, 2012 WL 738591 *1-4 (N.J. Sup. Ct. App. Div. Mar. 8, 2012).

As part of the plea agreement, Petitioner reserved the right to appeal the denial of his pretrial motion to suppress. The Appellate Division affirmed on appeal. *Id.* at *1.

I.     **STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

When a claim has been adjudicated on the merits in state court proceedings, a writ for habeas corpus shall not issue unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d); *see also Parker v. Matthews*, 567 U.S. 37, 40 (2012).

A state-court decision involves an "unreasonable application" of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case; or (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000). Federal courts must follow a highly deferential standard when evaluating, and thus give the benefit of the doubt to, state court decisions. *See Felkner v. Jackson*, 562 U.S. 594, 598 (2011); *Eley v. Erickson*, 712 F.3d 837, 845 (3d Cir. 2013). A state court decision is based on an unreasonable determination of the facts only if the state court's factual findings are objectively unreasonable in light of the evidence presented in the state-court proceeding. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e); *see Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct).

## II. DISCUSSION

Petitioner's § 2254 habeas petition raises two grounds, both related to pre-trial evidentiary rulings; they are: (1) the trial court erred in denying his motion for dismissal of the indictment on the basis of the destroyed, purported exculpatory evidence; and (2) the trial court erred in denying his motion to suppress inculpatory evidence of his computer search history on the basis of the prosecution's eve-of-trial discovery production.

Petitioner raised his two habeas claims on direct appeal. The Appellate Division in painstaking detail found that the trial court did not commit reversible error by allowing this evidence to be admitted. *See DiGirolamo*, 2012 WL 738951 at *1-4.

### A. Ground I – Evidentiary Ruling as it Pertains to the Saw

Petitioner's first claim is that the trial court erroneously denied his motion to dismiss the indictment, or in the alternative, to suppress the saw as evidence. (ECF No. 5 at 7). The Appellate Division decided both claims together. The Court addressed the motion to dismiss the indictment within the context of a prosecutor's failure to preserve evidence, relying on, *inter alia*, Supreme Court precedent, citing *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988). *See DiGirolamo*, 2012 WL 738951 at *4-7. The motion to suppress the saw was discussed within the context of Fourteenth Amendment Due Process protections and state evidentiary law pursuant to *Manson v. Brathwaite*, 432 U.S. 98 (1977) and N.J.R.E. 403. *Id.* at 7-8.

The saw in question was examined by both the state's and the defense's forensic analysts. While the state's experts concluded that a similar saw was used to dismember the decedent, Petitioner's expert determined that the particular saw in evidence was never used prior to the state's analysis. *DiGirolamo*, 2012 WL 738591 at *3. In that regard, Petitioner argued that the admission

of the altered-saw as evidence would be prejudicial, because there was no evidence of Petitioner having ever used the particular saw that was recovered.

      i.      Trial Court's Denial of the Motion to Dismiss the Indictment

The trial court denied Petitioner's motion, determining that he had not established that the state acted in bad faith as required by Supreme Court precedent. (ECF No. 15-15). The trial court opined that "this is not a case where the cumulative effect of losing the evidence deprives the defendant of all opportunity to create a reasonable doubt in the jury's mind." (*Id.* at 19).

The Appellate Division rejected this claim on Petitioner's direct appeal as follows:

> Prosecutors have a duty to preserve potentially exculpatory evidence on behalf of criminal defendants. *California v. Trombetta*, 467 U.S. 479, 486–87, 104 S.Ct. 2528, 2532–33, 81 L. Ed.2d 413, 420–21 (1984). The State's duty to preserve evidence is limited to evidence that "might be expected to play a significant role in the suspect's defense.... [E]vidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 488–89, 104 S.Ct. at 2534–35, 81 L. Ed.2d at 422–23. In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L. Ed.2d 281 (1988), *reh'g denied*, 488 U.S. 1051, 109 S.Ct. 885, 102 L. Ed.2d 1007 (1989), the Supreme Court expressly limited "the extent of the police's obligation to preserve evidence to reasonable bounds and confine[d] it to cases in which the police themselves by their conduct indicate[d] that the evidence could form a basis for exonerating the defendant." *Id.* at 58, 109 S.Ct. at 337, 102 L. Ed.2d at 289.
>
> In *State v. Hollander*, 201 N.J.Super. 453, 479 (App. Div.), *certif. denied*, 101 N.J. 335 (1985), we enumerated the following factors that a court must consider in deciding an evidentiary motion to dismiss: 1) the bad faith or connivance by the State; 2) the materiality of the evidence to the defense; and 3) the prejudice to the defense. *Ibid.*
>
> The first *Hollander* factor requires a trial court to consider "whether there was bad faith or connivance on the part of the government[.]" *Ibid.* The defendant bears the burden of proving bad faith. *Youngblood*, supra, 488 U.S. at 58, 109 S.Ct. at 337, 102 L. Ed.2d at 289. We have suggested that "bad faith" might apply to

destruction that occurred: "in a calculated effort to circumvent the disclosure requirements," as in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L. Ed.2d 215, 218 (1963); when there was an "allegation of official animus towards" the defendant; or when there was "a conscious effort to suppress exculpatory evidence." *State v. Serret*, 198 N.J. Super. 21, 26 (App. Div.1984) (quoting *Trombetta*, *supra*, 467 U.S. at 488, 104 S.Ct. at 2533, 81 L. Ed.2d at 421–22).

In *State v. Carter*, 185 N.J. Super. 576 (App. Div.1982), a case involving the suppression of exculpatory evidence, we concluded that even if actual intent to deceive was not present, "egregious carelessness" would warrant suppression. *Id.* at 580. We defined "egregious" as "conspicuously bad, flagrant." *Id.* at 581.

Here, the State's investigators allegedly altered an unused saw by performing tests that would support the State's case that the saw was used to cut the victim's bones. The trial court found that there was no evidence of bad faith on the part of the State; the State did not have a duty to preserve the evidence; and the State abided by standard procedures in handling the saw.

The trial judge correctly observed that the record is devoid of evidence of bad faith, as the term is commonly understood. There is no evidence of malice or intentional efforts to destroy exculpatory evidence. Furthermore, testing the saw on the cow bones was carried out according to standard procedures and practices. *Hollander*, supra, 201 N.J. Super. at 479 (finding good faith based on the fact that the evidence was destroyed in accord with "the State's normal practices"). However, according to defendant, the exculpatory nature of the saw, namely, its newness, should have been readily apparent to the State's investigators. Admittedly, defendant's expert did not confirm that the saw was new until after he cut bones with a new saw and observed the wear on the saw from cutting. But there were other indicia of newness, such as the original packaging on the saw when it was seized, as well as the absence of material on the saw that would link it to the dismemberment.

We note that in *Serret*, we held that the State's destruction of a Molotov cocktail was not prejudicial to the defendant because the Molotov cocktail had no apparent exculpatory value. *Id.* at 27. In that case, the defendant offered no argument that the Molotov cocktail bore any indications of his innocence; he merely challenged its destruction. In contrast, the newness of the saw in this case supports the inference that this particular saw was not used to dismember Giordano. We conclude that, although the State may

have acted with some degree of carelessness in not fully appreciating the significance of the saw's alleged "newness," such carelessness was not egregious conduct amounting to bad faith and warranting suppression. We note that the State conceded that aside from cut similarities, there were no other indicia of use of this saw on the victim.

The second prong of the *Hollander* test requires a showing that "the evidence suppressed, lost or destroyed was sufficiently material to the defense." *Hollander*, *supra*, 201 N.J.Super. at 479. The State has an affirmative duty to preserve "evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, *supra*, 467 U.S. at 488, 104 S.Ct. at 2534, 81 L. Ed.2d at 422.

[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.
[*United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct . 3375, 3383, 87 L. Ed.2d 481, 494 (1985).]

The New Jersey Supreme Court has held that "the materiality standard is not difficult to achieve." *State v. Nelson*, 155 N.J. 487, 500 (1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L. Ed.2d 788 (1999).

To be material, the "evidence must both possess an exculpatory value that was apparent before [it] was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, *supra*, 467 U.S. at 489, 104 S.Ct. at 2534, 81 L. Ed.2d at 422; *Hollander*, supra, 201 N.J. Super. at 479–80; *accord Serret*, *supra*, 198 N.J. Super. at 27 ("[t]h[e] "materiality standard is met only when the evidence possesses an apparent exculpatory value and is of such a nature that comparable evidence could not be obtained by other means").

Here, according to defendant, the State destroyed the evidence that the saw was unused. The evidence was material to the defense and apparently exculpatory before its examination because an unused saw would indicate that defendant did not use that particular saw to cut up Giordano's body, despite the fact that defendant purchased the saw around the time of Giordano's disappearance and that it was the only saw in his possession at the time the police executed a search warrant of his home. According to defendant, no evidence other than the saw itself, or a representation of the saw that

demonstrated its newness, would establish that the saw defendant purchased at the time of Giordano's disappearance and that was in his possession at the time of the search could not have been used to cut up Giordano's body.

The trial judge concluded that the saw could not be deemed evidentiary until the expert confirmed the saw could produce the marks left on the victim's remains. We disagree. The saw could be evidentiary before the expert tested it because defendant's purchase of the saw around the time of Giordano's disappearance, the fact of Giordano's dismemberment, and defendant's possession of the saw at the time the search warrant was executed made the saw relevant evidence, even before the expert compared the marks it left on cow bones to the marks on Giordano's bones.

The third *Hollander* factor is the degree of prejudice to defendant. *State v. Washington*, 165 N.J.Super. 149, 155 (App. Div. 1979). "Unfair prejudice" is defined as an undue tendency to suggest a decision on an improper basis. Fed. R. Evid. 403, Advisory Committee Notes to Federal Rules of Evidence; *see also* N.J.R.E. 403; *U.S. v. Bailleaux*, 685 F.2d 1105, 1111 n. 2 (9th Cir.1982) (" 'unfair prejudice' means that the evidence not only has a significant impact on the defendant's case (as opposed to evidence which is essentially harmless) but that its admission results in some unfairness to the defendant because of its non-probative aspect").

In *State v. Marshall*, 123 N.J. 1 (1991), the Court found that there was no prejudice to the defendant when the State's expert partially destroyed evidence in a test because "the State did not rely at trial on evidence no longer available." *Id.* at 110. Rather, "[t]he State's proof was its expert's testimony [about] an examination of the [evidence].... The expert's conclusions were subjected to cross-examination, and defendant's expert could have conducted the identical examination...." *Ibid.* Here, by contrast, the saw would have been defendant's proof. Defendant's ability to submit evidence that the saw was new was terminated when the State used the saw to cut cow bones.

However, defendant could cross-examine the State's expert about the condition of the saw at the outset of the expert's test. The State photographed the saw prior to testing and preserved pictures of the "burrs" indicative of a new saw. Defendant had pre-testing pictures of the saw, which defendant's expert utilized and which could form the basis of defendant's argument that the saw was unused at the time of Giordano's dismemberment. Defendant's expert could also replicate the degradation of the saw using the same model of saw.

> Additionally, in determining whether the defendant was prejudiced, our courts have considered whether destroyed evidence is wholly exculpatory. In *Marshall*, the Court held that the defendant was not prejudiced by the destruction of evidence when that evidence was not wholly exculpatory and "the jury would ... have had to weigh that evidence in the context of substantial additional evidence of guilt." *Id.* at 110. Here, the saw was not wholly exculpatory because proof that the saw was new would not resolve the issue of the cause of Giordano's death, and there was substantial additional evidence of defendant's guilt that a jury would have had to weigh against the evidence pertaining to the saw. Most important, the fact that defendant did not use the tested saw does not preclude the possibility that defendant used a cutting device that was never found. Defendant cannot establish the third *Hollander* factor, prejudice. The judge did not abuse his discretion in denying defendant's motion to dismiss the indictment.

*DiGirolamo*, 2012 WL 738591 at *4-7.

The seminal case assessing Fourteenth Amendment Due Process Clause violations within the context of the government's preservation of evidentiary material is *Arizona v. Youngblood*, 488 U.S. 51 (1988). There, the Supreme Court ruled that the Due Process Clause's protections were not violated, because the government's failure to preserve semen samples on a sexual assault victim's clothing for forensic analysis was not a result of bad faith. *Id.* at 58. In *Youngblood*, the challenged evidence was retrieved by the government almost immediately after the crime and in their possession for two years without having undergone analysis. *Id.* at 52-54. It was determined that the government's improper storage of the clothing rendered the forensic analysis inconclusive as to the perpetrator's identity. *Id.* at 54.

The *Youngblood* Court looked to its own then-four-year old decision in *California v. Trombetta*, 467 U.S. 479 (1984), to consider the likelihood of the unavailable evidence exonerating the defendant. *Id.* at 56. The Court determined that, although the materials may have exonerated

Youngblood, the fact that the prosecution was not using the materials in their case in chief, undermined Youngblood's claim.

*Trombetta* involved a defendant that was stopped on a suspicion of drunk driving and administered an Intoxilyzer test, indicating a blood-alcohol concentration over the legal limit. *Trombetta*, 467 U.S. at 482. Trombetta argued that the breath sample, which had not been preserved by police after it was analyzed, would have impeached the test results, and therefore, the state's failure to preserve was consequently a due process violation. *Id.* at 482-83. In rejecting Trombetta's claim, the Court opined, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488. The Court elaborated that constitutionally material evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Id.* at 489.

> "A defendant who claims destroyed evidence might have proved exculpatory if it could have been subjected to tests has to show the prosecution's bad faith in ordering or permitting its destruction." *United States v. Deaner*, 1F.3d 192, 200 (3d Cir. 1993). "Without a showing of bad faith, failure to preserve evidence . . . is not a denial of due process." *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). The Supreme Court has provided several examples of bad faith, such as "official animus towards respondents or. . . a conscious effort to suppress exculpatory evidence," *California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and "intentional [ ] delay [ ] to gain some tactical advantage," *Youngblood*, 488 U.S. at 57, 109 S.Ct. 333.

*United States v. Jones*, 503 F. App'x 178-79 (3d Cir. 2012).

Here, Petitioner has not demonstrated how the saw's eventual admission into evidence violates due process. First, as the state court determined, the record does not indicate bad faith

13

conduct and the state's concession that the saw was probably not used to dismember the decedent, underscored the absence of bad faith. Next, the saw's exculpatory value was not entirely apparent until analysis was conducted by the state's experts. Indeed, the trial court found that the "saw was not wholly exculpatory because its evidentiary value was not obvious before the test was conducted." (ECF No. 15-15 at 16). The defense expert's test determined that the saw could not have been used to dismember the decedent because it most likely had not ever been used. (ECF Nos. 15-6 at 105, 15-7 at 22). Notwithstanding the cardboard manufacturer's sleeve still on the saw blade at the time of its retrieval from Petitioner's home, it was not apparent that the saw was exculpatory by any means. In fact, the state's expert opined that the saw retrieved in Petitioner's home made cuts on the cow bones that were similar to those on the decedent. (*Id.* at 22, 24). Moreover, as already noted by the state court, Petitioner's ability to present photographic evidence depicting the saw's condition prior to the state's testing and to call witnesses to testify about the saw's condition prior to the state's testing was not hindered by the saw's alteration by state testing. As such, Petitioner was able "to obtain comparable evidence by other reasonably available means." This Court notes, however, that the Appellate Division's materiality analysis was a departure from that of the trial court. *DiGirolamo*, 2012 WL 738591 at *6. The Appellate Division determined that contrary to the trial court's determination that expert testing was necessary to determine the saw's evidentiary quality, "the saw could be evidentiary before the expert tested it because of defendant's purchase of the saw around the time of Giordano's disappearance, the fact of Giordano's dismemberment, and defendant's possession of the saw at the time the search warrant was executed made the saw relevant evidence." *Id.* Nonetheless, even though the saw was material to Petitioner's defense, its admission did not violate due process. *See Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005) ("Admission of evidence violates due process [o]nly if there

are not permissible inferences the jury may draw from it." (citations and internal quotations omitted). Consequently, the state court's determination was not an unreasonable application of clearly established federal law.

    ii.    Trial Court's Denial of the Motion to Suppress the Saw

The trial court denied Petitioner's Motion to Suppress the Saw relying mainly on state evidentiary law as well as the Fourteenth Amendment's Due Process Clause. *See DiGirolamo*, 2012 WL 738591 at *7-8.

> We reach the same result with regard [to the] motion to suppress the saw as evidence. Defendant moved to suppress admission of evidence of the saw on the grounds that the probative value of the proffered evidence was slight and there was a substantial risk of undue prejudice. Defendant also asserted that there was no evidence establishing a connection between the saw and the markings on the bones and that the introduction of the evidence would be prejudicial and confuse the jury. The court rejected defendant's arguments, finding the evidence to be highly probative and not outweighed by any trial integrity issues. The court concluded that the saw was "critical" to the State's case "because the jury [could] conclude it [was] similar to the kind of saw that was used to dismember the body of the victim."
>
> Defendant characterizes the saw as having little relevance while having substantial prejudicial value. Defendant concludes that admission of the allegedly modified saw effectively shifted the burden to defendant of proving that the saw was not the one used to cut Giordano's bones, with the result that defendant was denied a fair trial.
>
> Pursuant to N.J.R.E. 403, a judge, in his or her discretion, may exclude otherwise admissible evidence. To exclude such evidence, the judge must determine if the probative value of the evidence is outweighed by its prejudicial effect. The probative value of evidence is its "tendency ... to establish the proposition that it is offered to prove." *State v. Burr*, 195 N.J. 119, 127 (2008) (internal quotations and citations omitted). Unfair prejudice is an undue tendency to suggest a decision on an improper basis. N.J.R.E. 403; *see also Bailleaux*, supra, 685 F.2d at 1111 n. 2. "[R]eliability is the linchpin in determining admissibility" of evidence under a standard of fairness that is required by the Due Process Clause of the Fourteenth

15

> Amendment. *Manson v. Brathwaite*, 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L. Ed.2d 140, 153–54. (1977). If crucial inculpatory evidence is alleged to have been derived from unreliable sources, due process interests are at risk. *See State v.. Hurd*, 86 N.J. 525, 547 (1981).
>
> The judge acted within his discretion in determining that the saw was admissible under the N.J.R.E. 403 balancing test. The judge explained that the evidence was relevant because the State's expert opined that the experimental cuts on cow bones were similar to the cuts on the victim's remains. Because defendant would have had the opportunity to present his argument about the saw's newness to the jury, the relevance of the similarity in markings was not substantially outweighed by any prejudice defendant would have suffered as a result of the admission of the saw, which defendant claims could not have been involved in victim's dismemberment. The jury would be in a position to properly evaluate and weigh the saw evidence. The trial court properly denied defendant's motion to suppress the saw evidence.

*Id.*

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236 (1941). Petitioner has not established how the saw's admission violated due process. The challenged saw was found in his home, albeit unused. Scientific testing demonstrated that it was similar to the type of saw that was used to dismember the decedent and the state court held that its probative value outweighed any perceived prejudice.

This Court acknowledges Petitioner's concern that the saw's admission would unduly influence the jury. Notwithstanding this, a habeas petitioner's burden of proving a due process violation is high. *See Mendoza v. Leapley*, 5 F.3d 341, 342 (8th Cir. 1993) ("The habeas petitioner must establish an error which demonstrates a violation of due process by a burden much greater than that required on direct appeal and even greater than the showing of plain error.") (citations omitted). Here, to the extent that there is some prejudicial danger, Petitioner

has not established how the saw's admission would violate due process principles when the record reflects that an expert's testimony to advance the exculpatory nature of the saw was at Petitioner's disposal. "[W]hen evidence is highly probative, even a large risk of unfair prejudice may be tolerable." *United States v. Bailey*, 840 F.3d 99, 119 (3d Cir. 2016) (citation omitted); *see also Hatcher v. Ricci*, No. 08-5370, 2010 WL 3021875 at *17 (D.N.J. July 29, 2010) (citation omitted) ("Admission of highly probative evidence cannot be deemed a violation of due process guarantees simply because the defendant fears that this evidence might have a prejudicial effect."). The state court's application of federal law when denying the motion to suppress was not unreasonable. This claim is therefore denied.

### B. Ground Two- Computer Search History

Petitioner next claims that the trial court erroneously denied his motion to suppress evidence of his computer search history that was discovered shortly before his scheduled trial date. (ECF No. 5 at 9). Petitioner argues that the prosecution's search of the computer hard drive as his trial date approached, despite the hard drive being in their possession for more than three years, was indicative of bad faith. (*Id.*) Moreover, Petitioner argues that the search history, which was merely cumulative evidence, hindered his opportunity to investigate and prepare a proper defense to this untimely disclosure. (*Id.*)

The Appellate Division analyzed this claim pursuant to state law. *See DiGirolamo*, 2012 WL 738591 at *8-9. The state court ruled that Petitioner's prosecutorial misconduct claim was belied by the record which is devoid of any indication that there was a delay by the state in disclosing the evidence once it was discovered. *Id.* at 9. Moreover, the appellate court explained that any prejudice was ameliorated by the trial court's two-week trial adjournment to provide

17

Petitioner adequate time to review the evidence and to obtain an expert to address the newly discovered evidence. *Id.*

Petitioner does not explicitly raise any federal constitutional violations in his federal habeas petition. It is worth noting that "[a] district court shall entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court *only on the ground* that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254 (emphasis added). Nevertheless, even if this Court were to construe this claim as encompassing a federal element, it would fail for the following reasons.

First, allegations involving *Brady v. Maryland*, 373 U.S. 83 (1963), are analyzed as a type of prosecutorial misconduct, which claim requires certain elements be met. *See Banks v. Dretke*, 540 U.S. 668, 671 (2004). In that regard, Petitioner "must show that: (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material." *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004) (citations omitted). "[E]vidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).

Here, Petitioner has not established that the prosecution withheld evidence, even if the prosecution admittedly discovered the computer search history late in their case preparation. Next, Petitioner has not alleged nor established that the challenged evidence was exculpatory or of impeachment value. Rather, the evidence of search engine queries on how to lethally strike someone and locations in Delaware to abandon a child, was, as the state court pointed out, probative of Petitioner's state of mind in the period leading up to the decedent's murder and their child's abandonment. *DiGirolamo*, 2012 WL 738951 at *9.

Next, courts that have addressed the issue of whether delayed disclosure of inculpatory evidence violates a Petitioner's constitutional rights, have required that the defendant establish the prejudicial effect of the late disclosure.

> Late disclosure of inculpatory statements may, in certain circumstances interfere with a defendant's right to a fair trial, since substantial prejudice may result if counsel does not have adequate time to attempt to overcome the prejudicial effect of such evidence. In such a case, it is the responsibility of defense counsel to bring the matter of potential prejudice to the attention of the court prior to trial and either request a continuance or move the court for a ruling excluding the objectionable testimony on due process grounds. Such a procedure will afford the defendant the opportunity for a full and fair hearing as to defendant's objections, and will allow the trial court to make an informed decision as to how best to deal with any prejudice the defendant might otherwise suffer.

*United States v. Espericueta Reyes*, 631 F.2d 616, 623 (9th Cir. 1980) (citation omitted); *see also United States v. McCloud*, 585 F. App'x 881, 888 (6th Cir. 2014) (holding that inculpatory evidence produced on the eve of trial was not *Brady* as it was not exculpatory and no prejudice ensued because the trial court granted a one-day continuance to review the evidence).

Notwithstanding the inculpatory nature of the challenged evidence, Petitioner has not demonstrated how he was prejudiced by the trial court denying his motion to suppress the computer search history. *See United States v. Hill*, 659 F. App'x 707, 711 (3d Cir. 2016) (citing *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999) ("[T]he Supreme Court has rejected the contention that impeachment evidence does not qualify as *Brady* material merely because it is also inculpatory.")) The record reflects that the trial court granted a lengthy two-week adjournment such that Petitioner could conduct his own investigation of the newly discovered evidence. In conclusion, Petitioner has not established that a federally protected right was violated by the trial court's denial of his motion to suppress the computer search history evidence. Petitioner is denied habeas relief with respect to this claim.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right. Thus, no certificate of appealability shall issue.

### IV. CONCLUSION

For the reasons set forth above, the Petition is DENIED, and the Court DENIES a certificate of appealability.

Dated: July 19, 2018 /s/ Freda L. Wolfson
**Freda L. Wolfson, U.S.D.J.**